# Exhibit C

Owen, David                    CONFIDENTIAL                    May 26, 2006
London, England, UK

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------------

SMITH KLINE & FRENCH                    )

LABORATORIES LIMITED and                )Civil Action No.

SMITHKLINE BEECHAM CORPORATION          )05-197

d/b/a GLAXOSMITHKLINE,                  )

                Plaintiffs,             )

        vs.                             )

TEVA PHARAMCEUTICALS USA, INC.,         )

                Defendant.              )

----------------------------------------

**ORIGINAL**

THIS DEPOSITION TRANSCRIPT CONTAINS CONFIDENTIAL

MATERIAL THAT IS SUBJECT TO PROTECTIVE ORDER

Confidential Videotaped Deposition of:

DAVID OWEN

taken at the offices of WilmerHale

Alder Castle

10 Noble Street

London EC2V 7JU

ENGLAND

May 26, 2006

Owen, David             CONFIDENTIAL             May 26, 2006
                      London, England, UK

25

1    **facilitate technology transfer in the university in**

2    **Cardiff, which is where the Abcellute and Q-Chip**

3    **connections come.**

4         Q    These companies and organizations that you

5    mentioned having executive or director positions

6    with, do those companies -- do any of those

7    companies have relationship with GlaxoSmithkline?

8              MS. WIGMORE:  Objection to form.

9         **A    Does that mean --**

10             MS. WIGMORE:  You can go ahead and answer.

11        **A    Okay, because one of those companies,**

12   **Abcellute, has made a small number of sales to**

13   **GlaxoSmithkline.**

14        Q    What does Abcellute sell?

15        **A    Abcellute sells preserved hepatocytes.**

16        Q    Okay, so just to round out this area, do

17   you have any current relationship with

18   GlaxoSmithkline other than your work on this

19   litigation?

20        **A    No.**

21        Q    You previously mentioned US patent

22   4824860, it's been marked in a previous deposition

Owen, David              CONFIDENTIAL              May 26, 2006
                      London, England, UK

26

1    as exhibit 17, and I'll give you a copy now.

2    (Handed).

3        **A    Okay.**

4        Q    Do you recognize that document, Dr. Owen?

5        **A    Yes, I do recognize it.**

6        Q    When was the last time you saw it?

7            MS. WIGMORE:  I'm going to object and

8    instruct you not to reveal the substance of any

9    communications you may have had with lawyers.

10   If you can answer otherwise, go ahead.

11       **A    Would you repeat what you just advised me?**

12           MS. WIGMORE:  I'm instructing you not to

13   reveal the communications you may have had with

14   any attorneys.  If you can otherwise answer

15   that question, go ahead.

16       **A    With the exception of the interaction with**

17   **attorneys, I suspect I last saw it around about the**

18   **time it was prepared.**

19       Q    Okay.  Can you tell me how the application

20   for this patent was prepared?

21       **A    How it was prepared?**

22       Q    For example, who prepared it, and what

Owen, David                    CONFIDENTIAL                    May 26, 2006
London, England, UK

27

1    your involvement was with it.

2        A    Who prepared it is the patent department,

3    at what was then SmithKline & French.  How did they

4    prepare it?  They prepared it according to their own

5    professional expertise after discussions with me and

6    no doubt with others, but I --

7        Q    You said that the patent department

8    prepared it.  Were there any specific individuals

9    that you know of that prepared the patent

10   application?

11       A    I don't know who prepared the application

12   as it's presented to you here.  My recall of the

13   interaction with the patent department was

14   predominantly an interaction with Peter Giddings,

15   but what went on beyond that within the patent

16   department is not known to me and I suspect was

17   never known to me.

18       Q    You mentioned that you spoke with someone

19   in the patent department and it was likely Peter

20   Giddings, is that accurate?

21       A    I think it's probably prudent, with the

22   passage of time, to put likely, but I think

Henderson Legal Services
(202) 220-4158

Owen, David                 CONFIDENTIAL                 May 26, 2006
London, England, UK

31

1    to speaking with your attorneys, you reviewed this

2    patent.  Did you review the United Kingdom patent

3    application?

4         A    Wait a minute, when did I --

5         Q    Prior to speaking with your attorneys,

6    I asked you when was the last time you looked at it.

7         A    And I told you I imagined it was 1989.

8         Q    Okay, so when the patent issued?

9         A    And that's because -- well, I'm concerned

10   I may be speculating, but it seems sense to me that

11   I must have done at that stage, because I don't

12   recall it.  A lot of things happened in a lot of

13   times, as I'm sure you understand.

14        Q    Do you remember if you reviewed the

15   United Kingdom patent application that's referenced

16   on the cover page of the 860 patent before it was

17   filed?

18        A    I don't absolutely remember, no.

19        Q    Do you remember if you reviewed the US

20   patent application from which the 860 patent issued

21   before that US application was filed?

22        A    I don't remember it as an absolute fact.

Henderson Legal Services
(202) 220-4158

Owen, David                    CONFIDENTIAL                    May 26, 2006
London, England, UK

38

1      Q    Can you tell me how the invention that's

2   described in this 860 patent was conceived?

3           MS. WIGMORE:  I'm going to object to the

4           extent it calls for a legal conclusion, you can

5           give your own understanding.

6      A    I'll explain to you what I remember that

7   I did.  Ropinirole, under its company number, was

8   the subject of research activities in the SmithKline

9   research site in Upper Merion, and on the basis of

10  the data that was available at that point, was

11  designated for development as a cardiovascular drug.

12  At a point, and I don't know the substance and the

13  facts of it, a decision was made by the top

14  management in Philadelphia that the relative

15  research -- the relative resources for preclinical

16  research were unduly stretched in Philadelphia, but

17  there was capacity to do the preclinical development

18  work of this compound in the UK.  So a transfer was

19  made.

20           I was a senior member of the UK R&D

21  team in the UK, and I felt it was important, if we

22  were to try and do justice to this drug, that we

Owen, David                    CONFIDENTIAL                    May 26, 2006
London, England, UK

39

1     looked at whatever information was available to us

2     at this time, but also conducted some studies

3     ourselves for the purpose of understanding the

4     compound.  If I could give that a context --

5         Q     Let me ask you a little bit about the

6     context, not to interrupt, but you mentioned that

7     the project was transferred from Philadelphia to the

8     UK.

9         A     Yes.

10        Q     Were you involved in the project while it

11    was being worked on in Philadelphia?

12        A     I was not in any way directly involved in

13    the project, and I use the word "directly"

14    deliberately, because there was increasing exchange

15    across the Atlantic at this time, and so people from

16    Philadelphia may well have attended reviews of the

17    research programs that were taking place in the UK,

18    and people like myself would occasionally go to the

19    research reviews that were taking place in programs

20    in Philadelphia.

21            I certainly went to some program

22    reviews in Philadelphia.  I've thought hard and long

Owen, David               CONFIDENTIAL               May 26, 2006
                        London, England, UK

42

1        speculation.

2            A    I don't know.

3            Q    After the project, the ropinirole project

4    was transferred to the UK, were people in

5    Philadelphia still involved?

6            A    I don't really know what people in

7    Philadelphia were doing.  In a nonresearch sense,

8    for example, these -- management of these project

9    teams would have somebody from the marketing

10   department, and I certainly recall a guy called

11   Al Strack was marketing guy from Philadelphia, who

12   would go to virtually all these meetings, he was

13   a kind of permanent guy on an airplane.  But

14   substantively from R&D, I really don't know --

15   I don't remember is a more accurate way to express

16   it.  You were asking me what I was -- do you want

17   me -- or do you not want me to continue?  I don't

18   know.

19           Q    Let me just make sure that I -- before

20   I ask you to continue about that.  So you mentioned

21   that the project was transferred to the UK, is that

22   the point at which you first became directly

Owen, David               CONFIDENTIAL               May 26, 2006
                       London, England, UK

43

1    involved in the development of ropinirole?

2        A    Yes.

3        Q    So what did you -- so I had interrupted

4    you from answering what you did to conceive of the

5    invention described in the 860 patent.

6            MS. WIGMORE:  My same objection stands,

7        but go ahead and give your understanding.

8        **A    Sorry, I'm getting confused between what**

9    **the two of you said now, I'm trying hard to listen.**

10   **What did you -- sorry, could I ask you what you**

11   **asked me again, please?**

12       Q    I was just asking you to continue your

13   answer to the question of what you did to conceive

14   of the invention described in the 860 patent.

15           MS. WIGMORE:  And I had objected to the

16       extent it calls for a legal conclusion, but you

17       can give your answer.

18       **A    I can say what I did, can't I, without**

19   **running foul of that?  Can I spend one more moment**

20   **to give it a context?  I was the senior**

21   **pharmacologist in the UK and responsible for**

22   **a significant number of laboratories; I've been**

44

1    trying to work out who was when, and the

2    chronology's not easy, but I was responsible for

3    a number of laboratories, in one of which we were

4    doing the pharmacology for an antihypertensive

5    program, so in terms of that, we also regarded

6    ourselves -- and all those programs had, as part of

7    their nature, that they were cardiovascular

8    programs, or they were histamine programs, two

9    types, but what we knew about was also

10   cardiovascular.

11            When I read the information, I was of

12   the view that there were a small number of studies

13   which I nevertheless always paid particular

14   attention to with our own compounds, which had not

15   been done, and which it was my preference, because

16   I'm not sure there's a right and wrong here, but

17   there is a professional preference, and I was of the

18   view that the -- we would understand the properties

19   of what was then 101468 better if we did some

20   conscious animal cardiovascular measurements,

21   particularly being blood pressure and heart rate,

22   and certainly as part of profiling compounds, we

Owen, David                    CONFIDENTIAL                    May 26, 2006
London, England, UK

45

1    were of the habit of dosing -- entering into a sort

2    of short-term, but a number of doses, chronic

3    administration, in the sense of administering on

4    a number of occasions to the same animal, and those

5    were studies which had not been done in

6    Philadelphia, they were studies, I guess by

7    preference, rather than right or wrong, that we in

8    the UK preferred to have done.

9                   Roger Eden was the head of one of my

10   laboratories, and it was in his laboratory that

11   a particular type of experiment was done, at my

12   direction, and Annette Wright was the person who

13   actually did the day-to-day experiments.  So we

14   initiated experiments of the sort with which we were

15   familiar from our own programs, and started some of

16   these conscious animal cardiovascular studies with

17   101468.

18        Q    Let me see if I can clarify something.

19   You mentioned two different types of tests,

20   I believe, one is conscious animal studies and then

21   the second, I believe, was short-term testing with

22   a number of --

Owen, David                    CONFIDENTIAL                    May 26, 2006
                          London, England, UK

54

1      extent it would require you to reveal the

2      substance of any attorney-client

3      communications.  If you have knowledge

4      otherwise, go ahead and answer.

5          A    I know of them only as a result of what

6      I learned during preparation.

7          Q    So at the time you were actually doing

8      your research regarding ropinirole, you weren't

9      aware of any noncardiovascular conscious animal

10     studies that had already been conducted before the

11     start of your work on the project?

12         A    The way I'd like to answer that is by

13     saying what I was aware of was that this was

14     a compound with cardiovascular activity, and the

15     information was that it had no CNS effects.  That's

16     not -- you understand why I've answered it in that

17     way.

18         Q    You said that it had no CNS effects, was

19     that something that you learned when the ropinirole

20     project was moved to the UK?

21         A    It must have been.

22         Q    Did you do testing on the CNS effects of

55

1    ropinirole?

2         A    Not initially.  We did -- it was

3    a cardiovascular drug.  We, I was, my labs were

4    cardiovascular people.  We did the experiments that

5    we thought were appropriate to extend our

6    understanding of the cardiovascular profile, that

7    was the purpose, that's what we do, that's what we

8    know about.

9         Q    Okay.  At some point, was testing on the

10   CNS effects of ropinirole conducted in the UK?

11        MS. WIGMORE:  Objection.

12        A    Studies on the CNS effects of ropinirole

13   were made in the UK, yes.

14        Q    Why were those studies done?

15        A    Well, I'd like to bring that back into

16   context, if I might, please.

17        Q    Sure.

18        A    You asked me initially what we'd done, and

19   we, if you will, have moved on before we've had that

20   answer.

21        MS. WIGMORE:  I just want to be clear in

22        making an objection.  He was asked to explain

Owen, David                 CONFIDENTIAL                 May 26, 2006
                         London, England, UK

56

1        the conception, I don't think we've gotten

2        through that story, and you now seem to be

3        asking different questions so perhaps if we

4        could have an answer to that question, the

5        record will be more clear.

6              MR. BRAHMA:  We'll tie back to that in

7        a moment.

8              MS. WIGMORE:  I just want to make sure we

9        do get back because he's only finished part of

10       his answer.

11       **A     So we undertook cardiovascular studies,**

12       **that was to say cardiovascular studies were**

13       **undertaken by people who reported to me, in labs for**

14       **which I was responsible, cardiovascular studies in**

15       **conscious animals.  As a consequence of doing those**

16       **studies, and because of the behavioral responses in**

17       **the animals, the agitation and the signs of --**

18       **a word I find very hard to pronounce, but**

19       **stereotypy, we had cause to believe the compound may**

20       **well have CNS activities, that is the most -- even**

21       **to somebody who is first and foremost and**

22       **predominantly a cardiovascular pharmacology, that is**

Owen, David          CONFIDENTIAL          May 26, 2006
London, England, UK

57

1    the most obvious conclusion for those phenomena, so

2    what happened is kind of where all this questioning

3    started, is that under my instruction, Annette

4    Wright, working in Roger Eden's laboratory, did

5    these studies --

6        Q    When you say did these studies, do you

7    mean the cardiovascular studies?

8        A    She did the cardiovascular studies, yes,

9    I thought that's what we were still talking about.

10   They were studies of a nature that she would do most

11   days, and she observed that clearly there were some

12   behavior change in the rats with which she was not

13   normally familiar, and she came to my office to ask

14   me if I was free to come and look at the rats, which

15   is what I did, at which point it seemed to me

16   evidence that the most probable interpretation of

17   behavior was that there were indeed CNS activities

18   of the compound.

19            What I should say to you is my

20   initial reaction was one of concern, because we were

21   being asked to continue the development of

22   a cardiovascular drug without CNS effects which had

Owen, David             CONFIDENTIAL                    May 26, 2006
                     London, England, UK

58

1    come from my colleagues in Philadelphia, and as

2    a general rule, you would not really wish to see CNS

3    effects at the sorts of doses which you use to lower

4    blood pressure.

5        Q    Just so the record's clear, when you say

6    CNS, you mean central nervous system?

7        A    Yes, I do.  So as a -- certainly not

8    immediately, because my first concern was, oh dear,

9    there's a problem here, and we're going to be seen

10   as the guys creating the problem; on the other hand,

11   an adage which I had been taught is as long as you

12   do proper studies, the compound is what the compound

13   is in your results, I formed the view that actually,

14   this may actually be an advantage, rather than

15   a problem, and that we may have a drug which would

16   be useful for the treatment of Parkinson's disease.

17   So over a short period of time, and I can't be

18   precise what I mean by that, but not very long, but

19   definitely not instantaneously, I conceived the

20   hypothesis that this may be a treatment for

21   Parkinson's disease.

22       Q    And would it be fair to say then that you

Owen, David                CONFIDENTIAL                May 26, 2006
London, England, UK

59

1    came to that hypothesis, that ropinirole could be

2    used for the treatment of Parkinson's disease, based

3    on the observation of stereotypy and agitation in

4    the rats that Annette Wright was working with?

5        A    Yes.

6        Q    Was there anything else that you based

7    that hypothesis on?

8        A    I think I have to include -- remember at

9    this point I was the senior pharmacologist in the

10   UK, I guess at that stage I would have been seen as

11   one of the senior pharmacologists in the country,

12   you know, I was a member of the editorial board of

13   the British Journal of Pharmacology, I would go to

14   the meetings of the Pharmacological Society, on

15   occasions I would chair sessions, so I was

16   a cardiovascular guy plus some histamine knowledge,

17   because of the nature of Smith Kline and Tagamet,

18   etcetera, and I went to a lot of meetings. The

19   totality of what was in my mind at that stage to

20   conceive what was my hypothesis I can't be sure

21   about, it's a lot of general knowledge and some

22   specific things.

Owen, David                 CONFIDENTIAL                 May 26, 2006
                          London, England, UK

60

1    Q    But as far as the specific data related to

2    ropinirole, was that the only data you considered

3    before coming to your hypothesis that ropinirole

4    could be used to treat Parkinson's disease?

5         MS. WIGMORE:   Objection.

6    A    I can't -- it's too long ago for me to be

7    precise about everything which would have passed

8    through my mind at that stage, I just cannot recall

9    that level of detail.   I would say absolutely that

10   the evidence that there were -- that there was

11   agitation and stereotypy in the rats would have been

12   a factor, beyond a doubt, probably a rather large

13   factor.

14   Q    So let me back up a step.   You said that

15   when the ropinirole project was transferred to the

16   UK, you had received information from the

17   Philadelphia group indicating that ropinirole had no

18   CNS effects, is that correct?

19   A    No, I told you I cannot recall the detail

20   of exactly what I was told, what was contained in

21   the reports from Philadelphia.   You're testing my

22   memory beyond the point I can recall.   I also told

Owen, David                 CONFIDENTIAL                 May 26, 2006
                          London, England, UK

63

1        otherwise, go ahead.

2        Q    I'm willing to let you talk.

3        A    I know, they told me that you would be.

4   I can't recall how I did that.

5        Q    How you did what?

6        A    How I first communicated to others that we

7   had seen these effects which we were interpreting as

8   central nervous system effects.  I don't recall how

9   that was.

10       Q    Do you remember when you first

11  communicated to anyone else your hypothesis that

12  ropinirole could be used for treating Parkinson's

13  disease?

14       A    The best recall I have was that

15  I telephoned Professor Costall in Bradford.  If

16  you're asking me, did I talk to colleagues prior to

17  that, and I'm not sure which you were asking me, so

18  perhaps I should have asked you, but I can't recall

19  who else I might have spoken to.  I was of

20  sufficient seniority that I could make decisions of

21  that nature without having to run to anybody else;

22  equally, I was responsible for my decisions.

Owen, David                 CONFIDENTIAL                 May 26, 2006
London, England, UK

70

1    properties of clonidine, which was at one time

2    an interesting compound, indeed it made it to the

3    market for a while, but it's not a terribly good

4    antihypertensive agent.  It acts through its effects

5    within the central nervous system to elicit

6    peripheral cardiovascular effects.  So we worked on

7    that project.  I brought to the project the

8    cardiovascular activities, and Lionel Finch brought

9    to the project the CNS effects.

10       Q    Did Dr. Finch have experience in testing

11   compounds for anti-Parkinson's effectiveness?

12            MS. WIGMORE:  Objection.

13       A    Not to my knowledge, and I think I would

14   know if he did.

15       Q    Okay.  You previously said that

16   Professors Costall and Naylor had both a reputation

17   for working in the area of anti-Parkinson's research

18   and also I believe you said the proper models for

19   doing that testing.

20       A    They had developed models in order to

21   study anti-Parkinson's activities, yes.

22       Q    What models had they developed?

Henderson Legal Services
(202) 220-4158

Owen, David          CONFIDENTIAL          May 26, 2006
London, England, UK

71

1     A     The principal one known to me was their

2   marmoset model.

3     Q     And that was known to you before you

4   approached Professors Costall and Naylor?

5     A     I knew they had that, yes.

6     Q     So when you approached Professor --

7   I guess you first spoke with Professor Costall,

8   correct?

9     A     That's how I recall it, yes.

10    Q     So when you first spoke with

11  Professor Costall, did you direct her to run tests

12  using this marmoset model on ropinirole?

13    A     What I recall asking Brenda Costall, or

14  what I recall telling her was the nature of the

15  hypothesis that I had formed, and that -- gosh,

16  I was going to say I hoped, I'm not quite sure what

17  the right verb is there, but I believed that her

18  expertise would be greater than my expertise in

19  order to confirm the validity of what was my

20  hypothesis, and clearly, I went to her because

21  I believed she had expertise that I didn't have

22  myself.  I was a cardiovascular guy.  I was referred

Owen, David                CONFIDENTIAL                May 26, 2006
                        London, England, UK

72

1    to by my boss as a plumber, which is a fair comment

2    if you think about it, it's about pumps and pipes.

3        Q    So prior to approaching Dr. Costall to do

4    this experimental work, did you have a definite idea

5    that ropinirole could be used to treat Parkinson's,

6    or was that more of a guess?

7            MS. WIGMORE:   Objection.

8        A    No, it was absolutely in my mind that it

9    could be a treatment for Parkinson's disease, that

10   is a hypothesis that was formed, but I needed others

11   to confirm it, I didn't have the experimental models

12   under my direction to confirm that.  I wanted people

13   who if they confirmed it, others would believe them.

14       Q    And why did you believe, prior to

15   approaching Professor Costall, that ropinirole could

16   be used to treat Parkinson's disease?

17       A    We had evidence of a selective dopamine

18   agonist showing evidence that we interpreted as

19   consistent with CNS pharmacology, and now you're

20   asking -- in a sense, if you're asking me to go

21   beyond that, because to me, that provided the basis

22   to believe that it was a sound hypothesis to believe

Owen, David                CONFIDENTIAL              May 26, 2006
                        London, England, UK

80

1    Gallagher article that we --

2        **A    Correct, correct.**

3            MS. WIGMORE:  Before you go on, I just

4        want to object to the characterization as his

5        patent.  Could you be clear and use 860?

6        I think that would make the record more clear,

7        but go ahead.

8        Q    Is this not your patent, Dr. Owen?

9            MS. WIGMORE:  Objection, calls for a legal

10       conclusion.

11       **A    I'm content that it says inventor, David**

12   **AA Owen, and that is me.  I'm not sure whether**

13   **otherwise hairs are being split.**

14       Q    Is there anyone else that you think

15   invented this invention that's described in this 860

16   patent?

17       **A    I understand entirely that inventorship is**

18   **a legal matter.  To the best of my knowledge, and**

19   **I don't have that legal expertise, nobody else is**

20   **an inventor.**

21       Q    What is your understanding of what the

22   term inventorship means?

Owen, David        CONFIDENTIAL        May 26, 2006
London, England, UK

81

1        MS. WIGMORE:  I'm going to object, calls

2        for a legal conclusion.  Answer if you're able.

3      **A    I'm going to -- I'd like to answer with**

4 **a context.  Although I can't remember the details of**

5 **everything that was done, it was my nature and my**

6 **style to be transparent.  I disclosed information to**

7 **the patent department, and in my view, quite**

8 **correctly, the patent department were the**

9 **determinants of who was the inventor.**

10      Q    So did you disclose to the patent

11 department whether anyone else worked on the

12 development of ropinirole as a treatment for

13 Parkinson's disease?

14        MS. WIGMORE:  I'm going to object and

15        instruct you not to answer.

16      **A    I will take my instructions.**

17      Q    I'm going to mark as exhibit 97

18 a declaration that you signed.

19   (Exhibit Defendants' 97 marked for identification)

20      **A    Okay.**

21      Q    Do you understand what a declaration is?

22      **A    Yes, I believe so.**

Owen, David                    CONFIDENTIAL                    May 26, 2006
London, England, UK

82

1    Q   You understand the statements there?

2    **A   I understand there were a series of**

3  **statements which I would have read.**

4    Q   If you look on the first page of

5  exhibit 97, if you go to the second paragraph, it

6  says:

7      "I believe I'm the original first and sole

8      inventor, if only one name is listed below, or

9      an original first and joint inventor, if plural

10     names are listed below, of the subject matter

11     which is claimed and for which a patent is

12     sought on the invention entitled", and then it

13     goes on.

14      Do you see that?

15    **A   I do.**

16    Q   At the time you signed this declaration,

17  did you believe that statement to be true?

18    **A   Yes, I did.**

19    Q   There's only one inventor named on the

20  patent, correct?

21    **A   Correct.**

22    Q   So am I accurate in understanding that at

Owen, David            CONFIDENTIAL            May 26, 2006
                    London, England, UK

83

1  the time you signed this declaration, you believed

2  that you were the original first and sole inventor

3  of the invention, or of the subject matter that's

4  claimed in the 860 patent?

5      **A    That is what I believed, and the reason**

6  **I believed it is, as has been said, it's a legal**

7  **judgment, and that was the advice given to me by the**

8  **patent department.**

9          MS. WIGMORE:  I'm going to instruct you

10         not to reveal the substance of any

11         communications.

12     Q    Did anyone explain to you what the meaning

13  was of the term inventor as used in that sentence?

14         MS. WIGMORE:  I'm going to instruct you

15         not to answer to the extent your answer would

16         require you to reveal the substance of any

17         attorney-client communications.

18     **A    I don't recall at this time.**

19     Q    So you don't know whether at the time you

20  signed this declaration you knew what the term

21  inventor meant?

22         MS. WIGMORE:  Same instruction.

Henderson Legal Services
(202) 220-4158

Owen, David      CONFIDENTIAL      May 26, 2006
London, England, UK

94

1    remember what you gave to anyone in the patent

2    department relating to the preparation or submission

3    of this patent application that led to the 860

4    patent?

5          MS. WIGMORE:  You can answer that without

6        revealing the substance of any communication.

7        **A    I don't remember it anyway.  I really**

8    **don't.**

9        Q    Just to make sure the record's clear, is

10    it accurate to say that you don't remember what you

11    gave to anyone in the patent department relating to

12    the preparation of the United Kingdom application

13    from which the 860 patent claims priority?

14          MS. WIGMORE:  Same instruction.  When you

15        say what he gave, are you talking about

16        documents?

17          MR. BRAHMA:  Documents or information,

18        could be orally conveyed.

19          MS. WIGMORE:  So you're asking if he

20        remembers anything he shared with them in any

21        way?

22          MR. BRAHMA:  That's right.

Owen, David                    CONFIDENTIAL                    May 26, 2006
London, England, UK

95

1          MS. WIGMORE:  You can answer, but you

2      cannot reveal the substance of any

3      communication.

4          A    I simply don't remember it.  It almost

5      seems slightly strange to me that I don't remember

6      it, but I don't remember it, and therefore, I'm

7      simply unable to tell you.

8          MS. WIGMORE:  Can we break for lunch now?

9      It's been quite some time since we began.

10          MR. BRAHMA:  Just one question.  I believe

11      I'm just about on my 15 minutes.

12          Q    Do you remember anything else about the --

13      anything you did in contributing to the preparation

14      of the patent application that was either filed in

15      the US or the UK relating to the subject matter of

16      the 860 patent?

17          MS. WIGMORE:  You can answer the question

18      of whether you remember, but I instruct you not

19      to reveal the substance of any attorney-client

20      communications.

21          A    I don't recall it anyway.  I almost feel

22      like saying I'm sorry I don't recall it, but I don't

Owen, David          CONFIDENTIAL          May 26, 2006
London, England, UK

96

1    **recall it.**

2         Q    Okay, let's go on our break.

3              VIDEOGRAPHER:  Going off the record, the

4         time is 12.30.

5    (12.30 pm)

6                        OFF THE RECORD

7    (1.22 pm)

8              VIDEOGRAPHER:  This marks the beginning of

9         videotape number 2, back on the record, the

10        time is 13.22.

11        Q    Dr. Owen, before the break, you mentioned

12   that Dr. Naylor, you considered him to be an expert

13   on testing for CNS effects, is that correct?

14             MS. WIGMORE:  Objection.

15        **A    Bob Naylor and Brenda Costall were and**

16   **I think still are respected CNS pharmacologists.**

17        Q    Can you tell me what your understanding is

18   of their qualifications?

19             MS. WIGMORE:  Can I just clarify, you're

20        talking about at the time that he called them,

21        or at the present time?

22        Q    At the time that you called them.

Owen, David                      CONFIDENTIAL                      May 26, 2006
London, England, UK

97

1     **A     Well, they were both academic members of**

2     **staff in the pharmacy department at the University**

3     **of Bradford.  I could probably make a very informed**

4     **guess of their qualifications, but I don't**

5     **absolutely know their qualifications.  I am aware**

6     **and I was aware that they had published extensively**

7     **in CNS pharmacology.**

8          Q     And in your estimation, would both

9     Professor Costall and Professor Naylor be qualified

10    to speak to the subject matter of the 860 patent?

11          MS. WIGMORE:  Objection.

12    **A     I don't know, I don't know the answer to**

13    **that.  I don't know, for example, if they have ever**

14    **seen it.  I don't know.**

15          Q     But if they were shown it, would they be

16    able to speak to that subject matter?

17          MS. WIGMORE:  Objection, vague.

18    **A     Well, I don't know what their competencies**

19    **are beyond what I've told you as CNS**

20    **pharmacologists.**

21          Q     And some of their work is described in the

22    860 patent, correct?

Owen, David          CONFIDENTIAL          May 26, 2006
London, England, UK

98

1    A    Some of the experiments that they did

2  after I consulted with them are included in the

3  patent, that's correct.

4    Q    When you said you came up with the

5  hypothesis that ropinirole could be used to treat

6  Parkinson's disease, you said that there were two

7  factors that you considered aside from your general

8  knowledge of pharmacology, those being that you knew

9  ropinirole was a selective dopamine agonist on the

10 D2 receptor, and that also you had seen the CNS

11 effects from the experiments that Annette Wright had

12 been conducting, is that accurate?

13   A    I can't remember if I said that in this

14 deposition, but that would be accurate.  Whether

15 I've actually said it previously today, I can't

16 remember.  It's not -- as you've probably seen,

17 I wish I was feeling a bit more relaxed than I am.

18   Q    Let me ask you this: were you aware at the

19 time that you came up with your hypothesis about

20 ropinirole, were you aware of other compounds that

21 were selective D2 dopamine agonists that exhibited

22 CNS effects but were not effective in treating

Owen, David                CONFIDENTIAL                May 26, 2006
London, England, UK

99

1    Parkinson's disease?

2         **A    I don't know the answer to that.  I don't**

3    **remember what I knew at that level of detail at that**

4    **time.**

5         Q    At the time you came up with your

6    hypothesis about the potential use of ropinirole to

7    treat Parkinson's disease, did you think that there

8    were any other compounds that were structurally

9    similar to ropinirole that could be used for that

10   same purpose?

11        MS. WIGMORE:   Objection.

12        **A    My focus at that time was entirely on**

13   **ropinirole, there is one compound and one compound**

14   **alone that was the subject of a project development**

15   **program.**

16        Q    And you mean ropinirole by that one

17   compound?

18        **A    I mean ropinirole, I do embrace in that**

19   **salts of ropinirole, but one entity, if you will.**

20        Q    And ropinirole or its salts, that was the

21   only compound that you discussed with

22   Professor Costall, is that correct?

Owen, David                  CONFIDENTIAL                  May 26, 2006
                          London, England, UK

1    That doesn't distinguish for me, reading it now, as

2    to whether this was a follow-up to another meeting,

3    or may have reflected the first meeting, it doesn't

4    make that distinction.

5         Q    If you had a prior meeting with -- or

6    conversation with either Professor Naylor or

7    Professor Costall, would you have reported that to

8    this project team?

9              MS. WIGMORE:  Objection.

10        A    I don't know.  I mean, I just can't recall

11   that.

12        Q    This excerpt indicates that Professor --

13   that you were about to ask Professor Naylor about

14   the design of an investigation into the

15   neurobehavioral effects of SK&F 101468A, which you

16   previously identified as ropinirole, correct?

17        A    Yes, correct.

18        Q    Can you tell me what neurobehavioral

19   effects Professor Naylor or anyone else at Bradford

20   was being asked to investigate?

21        A    Well, we come back to the starting point

22   that the reason we went to Costall and Naylor, the

Owen, David          CONFIDENTIAL          May 26, 2006
London, England, UK

105

1    reason I went to Costall and Naylor originally,

2    I subsequently delegated it, was that they were one

3    of a number of groups who could do, as it's written

4    here, neurobehavioral studies, but they were

5    particularly expert in the context of models for

6    Parkinson's disease, and I wanted somebody who could

7    specific -- amongst the choices that might have been

8    available to me, in that I didn't approach others,

9    I can't say they were available, what I wanted --

10   I selected them because they were best equipped to

11   look at Parkinson models, ergo they were the people

12   best equipped to test the hypothesis that I had

13   taken them -- to them, and confirm whether it was

14   a sound or an unsound hypothesis, not many

15   hypotheses aren't sound, but what was very, very

16   important was to put such studies into context with

17   any other neurobehavioral CNS effects -- I would

18   regard those as almost interchangeable words -- and

19   the reason we went to experts for that broad profile

20   was to allow them to use their expertise and advise

21   me what other studies would be needed to give it

22   that context.  I went to experts for their

Owen, David                CONFIDENTIAL                May 26, 2006
                         London, England, UK

106

1    expertise.

2        Q    And what studies did either

3    Professor Naylor or Professor Costall indicate

4    should be done to determine if ropinirole had these

5    neurobehavioral CNS effects?

6        A    I simply can't remember that detail at

7    this stage, and I'm going to say now, because it

8    will come out, the nature of my -- of activity,

9    I set this up, was the hypothesis that I had

10   developed that was being tested for Parkinson's, but

11   I delegated a lot of the day-to-day activity to

12   others, and in particular to Roger Eden.

13       Q    Other than Mr. Eden, was there anyone else

14   that you delegated the day-to-day contact activity

15   with the Bradford researchers to?

16       A    I can't recall anybody else.  There's

17   a distinction between Roger was the guy who reported

18   to me, and therefore he was the only one whom

19   I could delegate.  If other folks from other parts

20   for whom I was not responsible talked to them, then

21   they talked to them.

22       Q    Okay, but the first contact between anyone

Owen, David                CONFIDENTIAL                May 26, 2006
London, England, UK

109

1    **test the hypothesis, and hence I went to**

2    **Professor Costall and Professor Naylor.**

3          Q      In describing your hypothesis or what you

4    wanted Professor Costall and Professor Naylor to

5    test for, did you focus only on the effectiveness of

6    ropinirole to treat Parkinson's disease, or were you

7    more broadly looking at all CNS effects?

8               MS. WIGMORE:   Objection.

9          **A      Well, the way I like to express it is the**

10   **way I've expressed it now two or three times, we**

11   **wanted to test the hypothesis for Parkinson's**

12   **disease, and put it into an overall context by**

13   **determining whether there were any other effects on**

14   **the central nervous system.**

15         Q      And I believe you said that the reason --

16   one of the reasons that you contacted

17   Professor Costall and Naylor was because you knew

18   that they had previously done work on a marmoset

19   model that could be used to determine effectiveness

20   in treating Parkinson's activity, is that --

21   Parkinson's disease, is that correct?

22         **A      I'm almost certain it must have been**

Owen, David                     CONFIDENTIAL                     May 26, 2006
                              London, England, UK

112

1    **had tested.**

2         Q    But they had tested some other compounds

3    for their effectiveness in treating Parkinson's

4    disease using the tests that are --

5         **A    I can't go --**

6              MS. WIGMORE:  Objection.

7         **A    Sorry.**

8              MS. WIGMORE:  Let him finish the question.

9         **A    I'm sorry.**

10             MS. WIGMORE:  Can you repeat the question

11   so the record's clear?

12             MR. BRAHMA:  Sure.

13        Q    But prior to your first contacting

14   Professor Costall, Professors Costall and Naylor had

15   tested some other compounds for their effectiveness

16   in treating Parkinson's disease using the tests that

17   they ultimately ran with respect to ropinirole, is

18   that accurate?

19             MS. WIGMORE:  Objection.

20        **A    I can't recall now what compounds I may or**

21   **may not have known at that time they tested.  But**

22   **I regarded them as people with models to test**

Owen, David               CONFIDENTIAL                May 26, 2006
                          London, England, UK

                                                                      113

1    **compounds for Parkinson's activity.**

2         Q    Let me take a step back.  You previously

3    mentioned the two factors that led you to

4    hypothesize that ropinirole might be effective in

5    treating Parkinson's: the selective D2 receptor

6    agonist activity and the observation of CNS effects.

7              At that point in time, if ropinirole

8    had shown no -- excuse me -- no D2 receptor agonist

9    activity, would you have believed that it would not

10   be effective in treating Parkinson's disease?

11        MS. WIGMORE:  Objection, calls for

12        speculation.

13        A    **You just asked me if ropinirole hadn't**

14   **shown D2 agonist activity, when there was a wealth**

15   **of information from Philadelphia that it did, so**

16   **it's a hypothetical question based on a false**

17   **hypothesis.**

18        Q    Well, you found CNS effects when

19   Philadelphia said there were no CNS effects,

20   correct?

21        A    **We found CNS effects, and the message was**

22   **that there weren't CNS effects.**

                  Henderson Legal Services
                     (202) 220-4158

122

1      department.

2          A      Insofar as I can't remember the detail of

3      the interaction, all I can say is I don't remember.

4          Q      Okay.  If one of the other compounds in

5      that general structural formula had been found to

6      have no D2 agonist activity, would you then conclude

7      that it would not be effective in treating

8      Parkinson's disease?

9              MS. WIGMORE:  Objection.

10         A      I have no basis to speculate one way or

11     the other.

12         Q      And you're saying that based on your

13     knowledge today, or based on your knowledge at the

14     time that you drafted this patent -- at the time the

15     patent application for the 860 patent was prepared?

16             MS. WIGMORE:  Objection.

17         A      I don't recall what happened in detail at

18     that time, therefore I'm unable to answer that

19     question.  As of today, by implication, it's the

20     best part of 20 years since I did active

21     pharmacology; anything what I knew, I only know less

22     now.

Owen, David                    CONFIDENTIAL                    May 26, 2006
                              London, England, UK

131

1    judgment for the patent department.

2         Q    But you reviewed --

3         A    Not a pharmacologist making

4    pharmacological judgments.

5         Q    But you reviewed this patent application

6    before it was submitted, correct?

7         A    Yes, I'm sure I reviewed it.

8         Q    And when you reviewed it, you said that

9    you were the first and sole inventor of the subject

10   matter that's claimed in this patent, correct?

11        A    That was signed on the piece of paper,

12   yes.

13        Q    But I believe what you said now is that

14   although there are a number of compounds that are

15   described and claimed in this patent, you only

16   developed a hypothesis as to one specific compound,

17   and that's ropinirole, was that accurate?

18        A    That is absolutely what I've said all the

19   way through, and that is accurate.

20        Q    And my question then to you is: based on

21   the information you had about ropinirole, would it

22   be -- would that information be sufficient to draw

Henderson Legal Services
(202) 220-4158

Owen, David               CONFIDENTIAL               May 26, 2006
                        London, England, UK

132

1    a hypothesis as to whether these other compounds

2    within that general structure would be effective in

3    treating Parkinson's disease?

4          MS. WIGMORE:  Objection.

5          **A      It is a matter for the legal department to**

6    **determine how broadly they then choose to draft the**

7    **patent.  They drafted it, I didn't draft it, I'm**

8    **very comfortable that they are very expert in the**

9    **drafting of patents, so I have tried to tell you as**

10   **reliably as I can what I did, and this is what the**

11   **legal department did by way of drafting arising from**

12   **that.**

13         Q    And that general structural formula in

14   column 2 of the 860 patent, that's not something

15   that you came up with, correct?

16         **A     Oh, very definitely correct.**

17         Q    So as far as you know, it's possible that

18   there are compounds covered by that general

19   structural formula that have absolutely no

20   effectiveness in treating Parkinson's disease, is

21   that accurate?

22         MS. WIGMORE:  Objection.

Henderson Legal Services
(202) 220-4158

Owen, David    CONFIDENTIAL    May 26, 2006
London, England, UK

169

1    tests, I went to the CNS experts.

2            If they say to me, "These are good

3    tests to test your hypothesis", my inclination, my

4    inclination at that time is to believe them, and

5    therefore they conducted those tests, but I happily

6    deferred to their expertise to know which tests

7    would be appropriate to evaluate what was my

8    hypothesis.

9        Q    Okay, and just to be clear, at the time

10   they were conducting these tests, they were not only

11   looking for effectiveness in treating Parkinson's,

12   but also other CNS effects, correct?

13       A    What I recall was going to them because

14   I -- they were the selected place, they were the

15   rational place to select as well, people to test the

16   Parkinson's hypothesis, but it's no good looking at

17   Parkinson's in isolation of any other effects the

18   compound may have on the central nervous system,

19   it's what -- what I referred to as putting the

20   Parkinson's effects into context with other CNS

21   activity.

22       Q    So not all these tests would necessarily

Owen, David                  CONFIDENTIAL                  May 26, 2006
London, England, UK

189

1    you believe this is a peer reviewed journal article,

2    correct?

3        **A      It is normal for things published in the**

4    **Journal of Medicinal Chemistry to be peer reviewed,**

5    **yes.**

6        Q    Do you know what the backgrounds would

7    have been of the people who would have reviewed this

8    paper?

9            MS. WIGMORE:   Objection.

10       **A      I have absolutely no basis to know what**

11   **their background is.**

12       Q    Would this paper have necessarily been

13   reviewed by CNS pharmacologists?

14       **A      That would be entirely a matter for the**

15   **editor, and I don't know who the editor is, nor what**

16   **would have influenced the decision.**

17       Q    Let me go up a little bit, I'm looking at

18   your patent again, exhibit 17, we were previously

19   looking at column 1, the paragraph starting at

20   line 54, I'm going to ask you to go to the paragraph

21   above that, which says:

22           "It has now been found that certain

Owen, David                    CONFIDENTIAL                    May 26, 2006
                            London, England, UK

190

1      indolone derivatives, known in the art as

2      presynaptic D2 agonists, having utility as

3      cardiovascular agents [and then it cites

4      a European patent] also are postsynaptic D2

5      agonists in the brain and hence are expected to

6      have utility in the treatment of Parkinson's."

7            Do you see that?

8      A    Yes, I do.

9      Q    Is that an accurate assessment of what you

10     hypothesized when you first spoke to -- before you

11     first spoke to Dr. Costall?

12     A    That's an accurate reflection of what

13     would be appropriate if the hypothesis was correct,

14     but if you're asking -- I need to be sure what

15     you're asking me, because that's not the language

16     I would have used with Professor Costall.

17     Q    At the time you first came up with the

18     hypothesis that ropinirole could be used to treat

19     Parkinson's disease, were you aware of this

20     distinction between presynaptic and postsynaptic D2

21     agonists?

22     A    I understand the concepts of presynaptic

Owen, David                CONFIDENTIAL                May 26, 2006
London, England, UK

191

1    D2 and postsynaptic D2 receptors, it's the receptors

2    that are crucial, the agonist is an agonist at D2

3    receptors, regardless of whether they're pre or

4    postsynaptic.

5        Q    Let me see if I understand that correctly.

6        A    It's a point of pharmacology obviously.

7        Q    So a compound will be a D2 receptor

8    agonist regardless of whether the receptor is

9    presynaptic or postsynaptic?

10        MS. WIGMORE:  Objection.  Go ahead.

11        A    If it's an agonist for D2 receptors, it

12    will be an agonist for D2 receptors, and whether

13    they are presynaptic or postsynaptic is a piece of

14    anatomy, not a piece of pharmacology.

15        Q    So you would expect a compound that was

16    a D2 agonist at a presynaptic D2 receptor to also be

17    a D2 agonist at a postsynaptic D2 receptor?

18        MS. WIGMORE:  Objection.

19        A    If a compound is a D2 agonist, I would

20    expect it to be a D2 agonist at D2 receptors

21    regardless of their anatomical location.

22        Q    And was that your understanding at the

Owen, David              CONFIDENTIAL              May 26, 2006
                       London, England, UK

192

1    time you first came up with the hypothesis that

2    ropinirole could be used to treat Parkinson's

3    disease?

4        **A    My hypothesis was that the D2 agonist, as**

5    **represented by ropinirole, it was ropinirole data**

6    **that I had, the hypothesis was that it could be**

7    **an anti-Parkinson's drug.  It wasn't necessary, nor**

8    **did I, to the best of my memory, make any statements**

9    **about the significance of pre or postsynaptic**

10   **location of the receptors, in order to -- that**

11   **wasn't necessary, in order to be a part of the**

12   **hypothesis.**

13       Q    So you knew that it was -- that ropinirole

14   was a D2 agonist, to you it didn't matter whether it

15   had an effect on presynaptic D2 receptors or

16   postsynaptic D2 receptors, in order to be effective

17   for Parkinson's disease?

18       MS. WIGMORE:   Objection.

19       **A    In order to be effective in Parkinson's**

20   **disease, the evidence that we have now is that it is**

21   **an agonist at postsynaptic receptors, but this --**

22   **whether it's pre or postsynaptic, in my view, is**

193

1    an absolute irrelevance.  A D2 agonist is a D2

2    agonist for D2 receptors regardless of their

3    location.

4        Q    Let me draw your attention a little bit

5    further up in column 1, the paragraph that starts at

6    approximately line 35 says:

7            "An alternative form of therapy is to

8        administer postsynaptic dopamine agonists, for

9        example, ergot alkaloids such as

10       bromocriptine."

11               Do you see that?

12       A    I do.

13       Q    When it's talking about an alternative

14   form of therapy, you're referring to therapy to

15   treat Parkinson's disease, right?

16       A    I'm sure that is what is intended, because

17   I'm reading it, and it doesn't say so, does it?  But

18   I'm sure that's what's intended.

19       Q    And are you familiar with the compound

20   bromocriptine?

21       A    I had some familiarity with bromocriptine

22   at that time.

Owen, David                CONFIDENTIAL                May 26, 2006
                        London, England, UK

208

1              MS. WIGMORE:   Objection.

2         A    And I'm telling you I don't remember

3    whether I might have done so on another occasion.

4         Q    So you don't specifically remember whether

5    you ever communicated information about your

6    invention to anyone from the patent department at

7    GSK?

8         A    I can't remember, there's nothing in my

9    head that says, "I remember that occasion when I did

10   so".  It's quite different to saying it did or

11   didn't happen, I'm saying I can't remember

12   an occasion when it happened.

13             I have recall in a very broad and

14   general sense of occasions when I went on the floor

15   where the patent department was, but I can't tell

16   you that I remember any discussion with them, and

17   because I was responsible for things other than just

18   this program, when I was there, I can't tell you

19   what topic I may have discussed with them.  I'm sure

20   it would help us both if I could, but I can't,

21   sorry.

22             MS. WIGMORE:   Nevertheless, I would

Owen, David                    CONFIDENTIAL                    May 26, 2006
                            London, England, UK

244

1    when it's administered to a patient with Parkinson's

2    disease, correct?

3            MS. WIGMORE:   Objection.

4        A    I wouldn't expect there to be any evidence

5    of anti-Parkinson activity, because based on my

6    knowledge, which may be limited, because I'm not

7    a clinician, I don't know how you could measure

8    anti-Parkinson activity.

9        Q    In a healthy patient?

10       A    In a healthy patient, so the statement

11   could be accurate, but one could wonder why on earth

12   it's been written.

13       Q    And again, your assumption there that this

14   test was done in healthy volunteers, what is that

15   based on?

16       A    Because the normal way to start studies is

17   in healthy volunteers, so I agree that that's

18   a supposition, but it's a very reasonable

19   supposition.

20       Q    Can you tell me what your educational

21   background is?

22       A    My educational background, after leaving

Henderson Legal Services
(202) 220-4158

Owen, David                CONFIDENTIAL                May 26, 2006
                        London, England, UK

245

1    school, I did a bachelors degree in pharmacy at the

2    College of Technology in Brighton.  I started a PhD

3    at the same institution, but shortly after starting,

4    my supervisor moved to the University of Aston,

5    which is in Birmingham, and I completed my PhD at

6    Aston.

7        Q    And in what area was your PhD?

8        A    The title of my PhD was "The interaction

9    between angiotensin and the sympathetic nervous

10   system".  It was a -- that means I did

11   a cardiovascular PhD.

12       Q    You previously said that you didn't

13   consider yourself to be an expert with respect to

14   CNS pharmacology.  Did you study CNS pharmacology as

15   part of either your bachelors or doctorate work?

16       A    We did a very small amount of work -- as

17   a pharmacist, one looked at things from the

18   perspective of drugs which may at that stage have

19   been marketed, you know, the pharmacist might deal

20   with that were CNS drugs, so I'm sure I did that

21   course, because that's going back another 20 years

22   beyond this, so that I would have done it is a fact.

Owen, David                    CONFIDENTIAL                    May 26, 2006
                            London, England, UK

                                                                      246

1   I can't, for example, remember we had an exam

2   question in finals on anaesthetics.  In my PhD,

3   I did not do any studies of CNS.

4        Q    And you wouldn't consider your coursework

5   to give you enough background in CNS pharmacology --

6        A    I certainly would not --

7             MS. WIGMORE:  Wait for the question to be

8   asked.

9        A    Sorry.

10       Q    Let me repeat it.  You wouldn't consider

11  your coursework to give you enough of a background

12  in CNS pharmacology to make you an expert in that

13  area?

14       A    Oh no, I've never been an expert in that

15  area, sorry.

16       Q    Have you worked with other compounds --

17  well, let me back up a step.  Once you finished your

18  PhD, did you start working?

19       A    Yes, I did start working on completion of

20  my PhD, I worked for Sando in Basle in Switzerland.

21       Q    And how long were you at Sandos?

22       A    I went there, gosh, September or October?

Henderson Legal Services
(202) 220-4158