# Exhibit E

Brenda Costall                CONFIDENTIAL                May 4, 2006
                             Washington, DC

1

                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF DELAWARE

          - - - - - - - - - - - - - - - - -x

          SMITH KLINE & FRENCH LABORATORIES, :

          LIMITED and SMITHKLINE BEECHAM      :

          CORPORATION d/b/a GLAXOSMITHKLINE, :   Civil Action

                         Plaintiffs,          :   No. 05-197

                    vs.                       :

          TEVA PHARMACEUTICALS USA, INC.,     :CONFIDENTIAL TRANSCRIPT CONTAINS

                         Defendant.           :MATERIAL THAT IS SUBJECT

          - - - - - - - - - - - - - - - -xTO PROTECTIVE ORDER


                    Videotaped Deposition of BRENDA COSTALL, a

          witness herein, called for examination by counsel

          for Defendant in the above-entitled matter, pursuant

          to notice, the witness being duly sworn by KAREN

          YOUNG, a Notary Public in and for the District of

          Columbia, taken at the offices of Kirkland & Ellis,

          655 15th Street, Northwest, Washington, D.C., at

          9:31 a.m. on Thursday, May 4, 2006, and the

          proceedings being taken down by Stenotype by KAREN

          YOUNG, and transcribed under her direction.

**ORIGINAL**

Brenda Costall                CONFIDENTIAL                May 4, 2006
                              Washington, DC

54

1        Q.    Even generally?

2        A.    **Reports to Smith Kline & French.**

3        Q.    In the course of your and your team's

4    research work on ropinirole, did you regularly send

5    reports to Smith Kline & French?

6        A.    **Yes.**

7        Q.    And can you tell me what those reports

8    were generally about?

9              MS. WIGMORE:   Objection, vague.

10       A.    **It is a long time ago.  I do not remember**

11   **the details.**

12       Q.    Is it fair to say that they were about

13   your experimental work, your and your team's

14   experimental work?

15       A.    **Yes, the reports would relate to the**

16   **experimental work.**

17       Q.    And would the reports include the results

18   of your experiments?

19       A.    **Yes.**

20       Q.    Other than the presentation, the paper and

21   other documents relating to reports, do you remember

22   if the documents you turned over to Wilmer Hale

Henderson Legal Services
(202) 220-4158

Brenda Costall                 CONFIDENTIAL                 May 4, 2006
                              Washington, DC

55

1    included any agreement between you and/or Bradford

2    University and the plaintiffs regarding the scope of

3    your research work?

4        **A.    I can remember that for definite because**

5    **we really did search for our contract, and that**

6    **again had been destroyed with the archives, so I**

7    **know it was not there.**

8        Q.    But there was a contract at some point?

9        **A.    There was a contract at some point.**

10       Q.    And who -- was the contract between you

11   and Smith Kline or was it between the university and

12   Smith Kline or some other --

13       **A.    Between the university and Smith Kline.**

14       Q.    Did it specify who would be doing the

15   research work governed by the contract?

16       **A.    No.**

17       Q.    Was the contract specific to research

18   regarding ropinirole?

19       **A.    Yes.**

20       Q.    Did the contract describe what research

21   work was to be done?

22       **A.    Only a general area.**

Henderson Legal Services
(202) 220-4158

Brenda Costall                CONFIDENTIAL                May 4, 2006
                              Washington, DC

56

1       Q.      And what was the general area?

2       A.      **Anti-Parkinson activity.**

3       Q.      Were there negotiations about that

4    contract?

5       A.      **There is a process by which contracts are**

6    **derived from the university between the university**

7    **and a company.**

8       Q.      And what is that process, if you know?

9       A.      **The head of our business liaison office**

10   **would draw up the contract, send it to his**

11   **counterpart -- and I don't know who that was -- at**

12   **Smith Kline French.  Then it would be returned**

13   **signed by him, signed by myself and signed by Smith**

14   **Kline & French.**

15      Q.      You said signed by yourself.  Is there a

16   reason that you would sign it?

17      A.      **As the chief investigator.**

18      Q.      Okay.  So the contract did specify who the

19   chief investigator was supposed to be?

20      A.      **It would normally do that.**

21      Q.      Would it specify who else would be among

22   the investigators?

Henderson Legal Services
(202) 220-4158

Brenda Costall                    CONFIDENTIAL                    May 4, 2006
                                  Washington, DC

57

1    A.    No.

2    Q.    You said that the -- the general area of

3    research specified in the contract was

4    anti-Parkinson's activity; is that correct?

5    A.    General, yes.  It would always make a

6    general statement.

7    Q.    When was the last time you saw the

8    contract?

9    A.    I can say before, before 1990.

10   Q.    Let me ask you, how did you first get

11   involved in doing this research work on ropinirole

12   for Smith Kline?

13   A.    I received a telephone call from Dr. David

14   Owen from Smith Kline & French.

15   Q.    And what did you and Dr. Owen discuss?

16   A.    Dr. Owen described to me some behavioral

17   effects that had occurred whilst observing this

18   compound then known as 101468, and he said that in

19   his view, that this represented a compound with

20   anti-Parkinson potential, and asked whether we would

21   be prepared to collaborate with them in confirming

22   his hypothesis.

Brenda Costall                CONFIDENTIAL                May 4, 2006
                            Washington, DC

58

1      Q.    Can you tell me approximately when that

2  conversation was?

3      **A.    Approximately 1986.**

4      Q.    Is it accurate to say that the contract

5  between the university and Smith Kline that we were

6  referring to earlier was signed after this

7  conversation?

8      **A.    Yes.**

9      Q.    Do you know when that contract was signed?

10     **A.    No.**

11     Q.    Did you take any notes of the conversation

12  with Dr. Owen?

13     **A.    No.**

14     Q.    Is there anything else that would help you

15  remember when that conversation with Dr. Owen took

16  place?

17     **A.    Nothing which is now available.**

18     Q.    Was there something that was previously

19  available that would have helped you remember that

20  date?

21     **A.    It may have been logged in by my secretary**

22  **in my diary.  The diaries of those dates have now**

Brenda Costall               CONFIDENTIAL                May 4, 2006
                             Washington, DC

69

1    are there any other effects that are associated with

2    anti-Parkinson's agents?

3           MS. WIGMORE:  Objection to form.

4       A.      **The main -- the main effect is on the lack**

5    **of movement.**

6       Q.    So that would be the bradykinesia?

7       A.      **Yes, that is the primary effect.**

8       Q.    So when you say that you were told by

9    Dr. Owen that ropinirole may have anti-Parkinson's

10   potential in that initial call that you had with

11   him, did you understand that to mean that ropinirole

12   might have an effect in reducing bradykinesia?

13      A.      **Yes.**

14      O.    Did you have any other understanding about

15   what he meant by the term anti-Parkinson's

16   potential?

17      A.      **He also mentioned that the compound caused**

18   **stereotyped behavior, which is a very specific**

19   **indication in animals on the effect of the D2**

20   **receptors and that would indicate anti-Parkinson**

21   **potential.**

22      Q.    You mentioned the D2 receptor.  Are you

Brenda Costall          CONFIDENTIAL          May 4, 2006
                        Washington, DC

73

1    Q.    During that initial call with Dr. Owen,

2    did the two of you discuss -- well, let me go back a

3    step.  Was there anyone else other than you and

4    Dr. Owen involved in that initial call?

5    A.    No.

6    Q.    Did the two of you discuss what types of

7    tests needed to be conducted to test the hypothesis

8    that anti -- that ropinirole had anti-Parkinson's

9    potential?

10   A.    No.

11   Q.    Did Dr. Owen explain to you why Smith

12   Kline wanted you and your team at University of

13   Bradford to conduct this investigation?

14   A.    He asked if we would conduct the

15   investigation to confirm the hypothesis, because

16   they didn't have all of the facilities in house.

17   Q.    What -- when you say facilities in house,

18   what facilities are you referring to?

19   A.    One would require animals which had been

20   lesioned and stereotactic surgery, very specific

21   work which is required in behavioral pharmacology.

22   Q.    And you're saying that those types of

Brenda Costall            CONFIDENTIAL              May 4, 2006
                           Washington, DC

74

1   animals, Smith Kline didn't have those?

2       A.     Correct.

3       Q.     Is there anything else that Smith Kline

4   lacked that was necessary to test for the

5   anti-Parkinson's potential of ropinirole?

6            MS. WIGMORE:  Objection, foundation.

7            BY MR. BRAHMA:

8       Q.     To your knowledge.

9       A.     To my knowledge, they would not have the

10  behavioral skills that we had at the University of

11  Bradford.

12      Q.     By behavioral skills, do you mean

13  experience in testing for behavioral effects?

14      A.     Experience in testing, yes.

15      Q.     So then it's accurate to say that as

16  expressed to you by Dr. Owen, the reason Smith Kline

17  asked you and your team at the University of

18  Bradford to test for ropinirole's anti-Parkinson's

19  potential was because you and your team had the

20  experience and the -- the test animals necessary to

21  conduct the -- those experiments?

22           MS. WIGMORE:  Objection to form.

Brenda Costall              CONFIDENTIAL              May 4, 2006
                            Washington, DC

75

1          BY MR. BRAHMA:

2     Q.     And Smith Kline didn't.  Is that accurate?

3     A.     Yes.

4     Q.     Would you consider yourself an expert in

5  the area of testing dopaminergic compounds for

6  central nervous system activity?

7     A.     Yes.

8     Q.     And can you tell me what qualifications

9  would make you an expert in that area?

10    **A.     One would need several years of training.**

11 **I had three years of training as a Ph.D. student and**

12 **subsequently approximately two years of training as**

13 **a postdoctoral person.**

14    Q.     And when you say that you had this several

15 years of training, you mean that that was your

16 experience at the time of your initial call with

17 Dr. Owen?

18    **A.     That is -- you are asking if I had that**

19 **experience.  Yes.**

20    Q.     And you mentioned several years of

21 training.  Training in what specifically?

22    **A.     In carrying out brain surgery in**

Brenda Costall            CONFIDENTIAL            May 4, 2006
                          Washington, DC

79

1        A.      My qualifications would be such at that

2   time.

3        Q.      And you said you had expertise in testing

4   for animal behavior which would indicate

5   anti-Parkinson potential.  Was that -- was your

6   previous testing with other compounds?

7        A.      Yes.

8        Q.      Can you tell me what those other compounds

9   were?

10       A.      They fall into groups.  One was a group of

11  compounds called the aporphines.  One was called the

12  aminotetralines, and then there are individual

13  compounds such as bromocriptine and pergolide.

14       Q.      And your work prior to your initial call

15  with Dr. Owen involved those four compounds that --

16  well, perhaps they're classes of compounds.

17       A.      They are classes.

18       Q.      The aporphines, the aminotetralines,

19  bromocriptine and pergolide?

20       A.      Yes.

21       Q.      Are there any others that you can

22  remember?

Brenda Costall          CONFIDENTIAL          May 4, 2006
                        Washington, DC

80

1      A.      Not that I can remember.

2      Q.      In your prior experience in testing of

3   compounds for anti-Parkinson's activity, what types

4   of tests did you run?

5      A.      Tests for hyperactivity, stereotyped

6   behavior and circling behavior.

7      Q.      And would it be fair to say that those are

8   the same types of tests that you ran on ropinirole

9   at Dr. Owen's -- or Smith Kline's request?

10     A.      Yes.

11     Q.      Before those tests, or those types of

12  tests are run, is it possible to conclude that a

13  compound such as ropinirole has anti-Parkinson's

14  activity?

15         MS. WIGMORE:   Objection to form.

16     A.      I think it is possible to make

17  observations as it did at Smith Kline & French that

18  an animal is showing types of behavior which is

19  indicative of anti-Parkinson potential.

20     Q.      With respect to the -- you said you ran

21  three type of tests to test for anti-Parkinson

22  potential, hyperactivity tests, stereotypy tests and

Brenda Costall          CONFIDENTIAL          May 4, 2006
                        Washington, DC

87

1    Q.    Based on tests you and your team

2    conducted, were you able to conclude whether

3    ropinirole has anti-Parkinson's activity?

4    **A.    The work that we carried out confirmed the**

5    **hypothesis presented by Dr. Owen that ropinirole had**

6    **anti-Parkinson potential.**

7    Q.    Was there a specific test among the ones

8    you conducted that allowed you to reach that

9    conclusion?

10   **A.    The tests as a battery are required.  No**

11   **individual test would give you that answer.**

12   Q.    So for example, just the results of MPTP

13   model tests wouldn't be sufficient for you to

14   conclude that ropinirole had anti-Parkinson's

15   activity.

16   **A.    I believe you need additional tests.**

17   Q.    With respect to the tests that you

18   conducted, did you develop the test plan?

19   **A.    The test plan was developed jointly**

20   **between myself and Smith Kline & French.**

21   Q.    Was there someone at Smith Kline that

22   worked with you on developing the test plan?

Brenda Costall                 CONFIDENTIAL                 May 4, 2006
                              Washington, DC

88

1      A.     Yes, it was Roger Eden.

2      Q.     And did Mr. Eden tell you whether to run

3   any particular tests?

4      A.     We discussed the protocol together and we

5   decided together on which test to use.

6      Q.     Did Mr. Eden or anyone else at Smith Kline

7   tell you what effects -- what physiological effects

8   they wanted you to test ropinirole for?

9      A.     It was implicit in the contract that we

10  were looking for anti-Parkinson potential, and

11  therefore, we discussed what we would be looking

12  for.

13     Q.     You mentioned the contract.  That reminded

14  me to go back and ask you one question.  Under the

15  contract, was the university required to assign to

16  Smith Kline any intellectual property it developed,

17  to your knowledge?

18     MS. WIGMORE:  I'm going to object to the

19  extent it calls for a legal conclusion, but you can

20  give your understanding.

21     A.     The understanding at the time was that the

22  University of Bradford's interest in working with

Henderson Legal Services
(202) 220-4158

Brenda Costall  CONFIDENTIAL  May 4, 2006
Washington, DC

89

1  pharmaceutical companies was to be associated with

2  drugs being developed and progressing to man because

3  of the prestige of that involvement, and therefore,

4  at that time, the University of Bradford would

5  assign the intellectual property rights to the

6  company.

7      Q.    And that was a requirement of the contract

8  as far as you know?

9      A.    The contract did require that.  That was

10  standard at the time.

11      Q.    Did the university get any compensation

12  for doing that?

13          MS. WIGMORE:  Same objection.  Go ahead.

14      A.    As pharmacologists, the tools of our trade

15  are the drugs which come from the company.  We feel

16  it was a privilege to be able to work with

17  ropinirole.  It was equally a privilege the fact

18  that that compound was eventually a drug of value in

19  man.  That gives credit to the university and its

20  scientists, therefore, the capacity to develop drugs

21  and helping in the capacity to develop drugs through

22  to man, and in that respect, their main aim was the

Brenda Costall            CONFIDENTIAL            May 4, 2006
                          Washington, DC

90

1    prestige in that development and not gaining IPR or

2    other royalty or other income from a company.

3        Q.    Under the contract, did the university do

4    any testing of ropinirole in man?

5        A.    No.

6        Q.    Under the contract, did the university do

7    any testing other than the work you and your team

8    did?

9        A.    No.

10       Q.    Separate from this particular contract,

11   did the university do any testing on ropinirole

12   other than the work you and your team did?

13       A.    No.

14       Q.    Did the university do any work on other

15   dopaminergic compounds?

16            MS. WIGMORE:   Object, vague as to time.

17   Do you mean at any time?

18            BY MR. BRAHMA:

19       Q.    Yeah.

20       A.    Well, I've already said that my team

21   tested other compounds.

22       Q.    Was any of the work your team did or

Henderson Legal Services
(202) 220-4158

91

1    anyone else at the university did relating to other

2    dopaminergic compounds -- was that work for Smith

3    Kline?

4         **A.    No.**

5         Q.    So then it's accurate to say that you and

6    your team haven't done work on any other

7    dopaminergic compounds for Smith Kline.

8         **A.    Correct.**

9         MR. BRAHMA:  Let's take a break and switch

10   tape.

11        THE VIDEOGRAPHER:  This marks the end of

12   Videotape Number 1 in the deposition of Brenda

13   Costall.  We are going off the record.  The time is

14   11:33 a.m.

15             (Recessed at 11:33 a.m.)

16             (Reconvened at 11:49 a.m.)

17        THE VIDEOGRAPHER:  This marks the

18   beginning of Videotape Number 2 in the deposition of

19   Brenda Costall.  We are back on the record.  The

20   time is 11:49 a.m.  Counsel may proceed.

21        BY MR. BRAHMA:

22        Q.    We've been discussing your initial call

Brenda Costall          CONFIDENTIAL          May 4, 2006
                        Washington, DC

92

1   with David Owen about the research you and your team

2   were asked to perform regarding ropinirole, and at

3   that point, you said that you weren't aware even of

4   what the chemical structure of ropinirole was,

5   correct?

6       A.    Correct.

7       Q.    You also mentioned that after that call,

8   you had a meeting in late 1986 or early 1987.  Is

9   that accurate?

10      A.    Yes.

11      Q.    And you said that you remember Dr. Owen

12  and Mr. Eden from Smith Kline being at that meeting.

13  Do you remember anyone else being at that meeting?

14      A.    No.

15      Q.    Were any other people from the university

16  at that meeting?

17      A.    No.

18      Q.    Were there any documents that you were

19  shown at that meeting?

20      A.    No.

21      Q.    What was discussed at that meeting?

22      A.    We discussed at that meeting how the

Brenda Costall           CONFIDENTIAL           May 4, 2006
                         Washington, DC

93

1  **University of Bradford, my team in particular, could**

2  **collaborate with Smith Kline & French to confirm the**

3  **hypothesis that the compound 101468-A as it was then**

4  **had anti-Parkinson potential.**

5      Q.    Either in this meeting or in the initial

6  call with Dr. Owen, did anyone explain to you why

7  you and your team at the university were selected to

8  do this work?

9      A.    **Not specifically, but my team is known to**

10 **be one of the senior teams in the university system**

11 **in the U.K., and we were known internationally as**

12 **experts in this area.  I also knew Dr. Owen of**

13 **course and he would know my expertise.**

14     Q.    When you say you were known

15 internationally as experts in this area, you were

16 known -- do you mean you were known at that time?

17     A.    **At that time.**

18     Q.    And when you refer to the area, what area

19 are you referring to?

20     A.    **The -- my area of specialism was the study**

21 **of agonists and antagonists of dopamine receptors in**

22 **the brain.  I prefer to use the brain than the CNS.**

Henderson Legal Services
(202) 220-4158

Brenda Costall           CONFIDENTIAL           May 4, 2006
                         Washington, DC

94

1    It's more specific.

2        Q.    You said you knew Dr. Owen.  How did you

3    know him at that time?

4        A.    Within the U.K. system, we have a British

5    Pharmacological Society, and at those meetings, we

6    would meet all the eminent pharmacologists.  I met

7    Dr. Owen on many occasions at those meetings, and

8    senior scientists, which I was and he was, knew each

9    other from those meetings.

10       Q.    The British Pharmacological Society that

11   you mentioned -- is that the same organization that

12   is listed on Exhibit 33, your profile?

13       A.    On my profile, yes.  I've always had a

14   close relationship with that organization.  I am a

15   member, and at the moment, I am chair of all the

16   heads of pharmacology on behalf of the British

17   Pharmacological Society.  There's actually an

18   international society.  It runs very broadly across

19   the world.

20       Q.    Are representatives of pharmaceutical

21   companies also members of that society?

22       A.    Yes.

Brenda Costall                CONFIDENTIAL                May 4, 2006
                             Washington, DC

95

1    Q.    And Dr. Owen was a member of that society?

2    **A.    Yes.**

3    Q.    And is that the only way in which you knew

4    Dr. Owen?

5    **A.    And by repute.  I am a pharmacologist, and**

6    **we do know the senior pharmacologists both within**

7    **our own country and who are internationally**

8    **recognized.**

9    Q.    You mentioned Dr. Owen's reputation.  Did

10   he have a reputation for being involved in the

11   testing of agonists and antagonists -- sorry, the

12   testing of the dopamine agonist and antagonist

13   effects of compounds in the brain?

14   **A.    He wouldn't have the specific expertise,**

15   **but he was sufficiently senior to be able to**

16   **recognize those effects when they occur.**

17   Q.    Was there an area in which he had a

18   reputation for being specialized?

19   **A.    I always knew him as a cardiovascular**

20   **specialist.**

21   Q.    And when you say cardiovascular

22   specialist, is that specifically with respect to

Brenda Costall                    CONFIDENTIAL                    May 4, 2006
                                  Washington, DC

96

1    dopamine agonist and antagonist activity or more

2    broadly?

3        A.    More broadly.

4        Q.    You said during your meeting with Dr. Owen

5    and Mr. Eden in either late 1986 or early 1987, did

6    you discuss anything other than the types of

7    research tests you would be performing on

8    ropinirole?

9        A.    No.

10       Q.    Under the contract, was the university

11   compensated for the research work that you did on

12   ropinirole?

13            MS. WIGMORE:  I object to the extent it

14   calls for a legal conclusion.  You can give your own

15   understanding if you have one.

16       A.    The university would require payment for

17   the costs of the animals and for the personnel

18   involved in carrying out the work.

19       Q.    And what payment would they receive for

20   the personnel involved in carrying out the work?

21       A.    I would calculate out their hourly

22   activities and would calculate up with a sum of

Henderson Legal Services
(202) 220-4158

97

1    money.

2        Q.    We previously talked about whether you are

3    being compensated for your time in working on this

4    litigation or your involvement in this litigation,

5    and I believe you said that you are not; is that

6    correct?

7        A.    **That is correct.**

8        Q.    Is the university being compensated for

9    the time you're spending in your involvement in this

10   litigation?

11       A.    **No.**

12       Q.    At the meeting that you had with Dr. Owen

13   and Mr. Eden in late 1986 or early 1987, was that

14   the first time that you became aware of the chemical

15   structure of ropinirole?

16           MS. WIGMORE:   Objection, assumes facts.

17       A.    **The first meeting I said we -- I did say**

18   **this previously.  We did not have a confidentiality**

19   **or a contract at that point, and therefore, I did**

20   **not see the chemical structure.**

21       Q.    After the -- can you tell me approximately

22   how long after that first meeting the

Brenda Costall          CONFIDENTIAL          May 4, 2006
                        Washington, DC

98

1    confidentiality agreement was signed?

2       A.    **Within three -- three months**.

3       Q.    And after the confidentiality agreement

4    was signed, were you told what the chemical

5    structure of ropinirole was?

6       A.    **I do not remember specifically, but I was**

7    **given information about the background of the**

8    **compound.  I'm not a chemist and therefore was not**

9    **particularly interested in the chemistry.**

10      Q.    But the background information you were

11   given about the compound included its chemical

12   structure?

13      A.    **Yes.**

14      Q.    Based on the chemical structure, did you

15   have any reason to believe that the compound would

16   or would not have effects in the brain?

17      A.    **I am not an expert in medicinal chemistry.**

18      Q.    Before, you had mentioned that you were an

19   expert in a particular area of pharmacology.  Can

20   you tell me what you mean by pharmacology?

21      A.    **Pharmacology is the study of drugs on the**

22   **physiology of the body, so therefore, we look at how**

Henderson Legal Services
(202) 220-4158

Brenda Costall          CONFIDENTIAL          May 4, 2006
                        Washington, DC

99

1   the body works normally, how it goes wrong, then how

2   drugs can be used to correct that abnormality and

3   therefore to create a medicine to treat disease.

4        Q.    Is it correct to say that pharmacology

5   then is not -- or does not include the correlation

6   of those physiological effects with the chemical

7   structures of compounds?

8        A.    That is correct, though they are separate

9   disciplines.  There is a discipline of medicinal

10  chemistry, and when you break down the degree of

11  pharmacy and you are pharmaceutical chemistry,

12  pharmacology, pharmaceutical technology and

13  pharmacognancy, which is the study of plant

14  materials, so they are separate disciplines.  Sorry

15  if I'm speaking too quickly.

16       Q.    And then would medicinal chemistry be the

17  area that properly includes analysis of how the

18  structure of a chemical compound relates to a

19  physiological effect that results from administering

20  that compound?

21            MS. WIGMORE:  Objection, lack of

22  foundation, calls for expert opinion.

Henderson Legal Services
(202) 220-4158

Brenda Costall              CONFIDENTIAL                May 4, 2006
                            Washington, DC

126

1    contract between Smith Kline and the University of

2    Bradford, correct?

3        A.    Yes.

4        Q.    Aside from the experiments described in

5    that test plan, did you or members of your team

6    conduct other experiments related to ropinirole?

7        A.    No.

8        Q.    Did the test plan change from the time the

9    contract was executed to the present day?

10       A.    No.  **Each time we changed our test plan,**

11   **another contract would be generated to cover the new**

12   **plans.**

13       Q.    So there were multiple contracts?  Is that

14   accurate?

15       A.    **There are certainly two contracts.**

16       Q.    And do you remember who from Smith Kline

17   signed either of those, or any of those contracts?

18       A.    **Both were signed off from Smith Kline and**

19   **by Dr. David Owen.**

20       Q.    And earlier, you said there are certainly

21   two contracts.  I want to make sure that I

22   understand correctly.  Are you certain that there

Brenda Costall              CONFIDENTIAL                May 4, 2006
                            Washington, DC

127

1    are only two contracts?

2       A.    No.

3       Q.    Or you're certain that there are at least

4    two contracts?

5       A.    **There were two contracts, but there could**

6    **have been other contracts.  I only remember the two**

7    **major contracts.**

8       Q.    And do those two contracts correspond to

9    the two phases -- or sorry.  Do the two contracts

10   that you remember, do those correspond to the two

11   phases of your research work?

12      A.    **Again, because I haven't seen these for a**

13   **long time, I am having to speculate, but the first**

14   **contract defined, as I said, the rodent work; the**

15   **second contract, the primate work.**

16      Q.    And is that distinction between the rodent

17   work and the primate work, is that -- is it fair to

18   say that that's the distinction -- the same

19   distinction that you're making between the initial

20   phase of your research and the second phase of your

21   research?

22      A.    **Approximately.**

312

1      Q.    And then at the end of the conclusion --

2   of the overall conclusions on this slide, the

3   statement says, "The preclinical data provides firm

4   support for the development of ropinirole for the

5   treatment of the neurological and psychiatric

6   disturbances associated with Parkinson's disease."

7   Do you see that?

8      **A.    Yes.**

9      Q.    And that again is consistent with the

10  experimental results that your team at the

11  University of Bradford conducted -- obtained?

12     **A.    Yes, it's consistent both with the**

13  **original hypothesis forwarded by Dr. Owen, and we**

14  **are simply -- we are confirming what we've seen in**

15  **the laboratories, that all of this work has still**

16  **got the same conclusion, that this drug has**

17  **anti-Parkinson potential.**

18     Q.    The conclusions that you came to based on

19  the results of your team's experimental work -- did

20  you come to those conclusions independently?

21     **A.    Independently of whom?**

22     Q.    Independently of Dr. Owen, Mr. Eden or

Brenda Costall               CONFIDENTIAL                    May 4, 2006
                             Washington, DC

313

1    anyone else at Smith Kline?

2         MS. WIGMORE:  Objection to the form.

3    A.   They would have been done -- these would

4    have been formed collectively.  I've explained all

5    the way through this work, it was very much a

6    collaborative effort.  We discussed our

7    presentations and we discussed the format of

8    reports, papers and the talks.  So this wouldn't be

9    something which was just Brenda Costall and her

10   team.  It would be Brenda Costall, her team in

11   collaboration with Smith Kline & French.

12        Q.    You previously mentioned periodically

13   reporting the results of your experiments either by

14   telephone to Dr. Owen or in meetings with Mr. Eden.

15   Was it during those telephone conversations and

16   meetings -- is that what you're talking about when

17   you're talking about the collaborative effort in

18   coming to these conclusions?

19        A.    Yes, we discussed considerable amount of

20   data and we would consider how that could be best

21   interpreted and we would do that jointly, but not

22   over a telephone.  My telephone calls were generally

Henderson Legal Services
(202) 220-4158