# Exhibit F

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

--------------------------------x

ORIGINAL

SMITH KLINE & FRENCH            : THIS DEPOSITION

LABORATORIES LIMITED and        : TRANSCRIPT CONTAINS

SMITHKLINE BEECHAM CORPORATION  : CONFIDENTIAL MATERIAL

d/b/a GLAXOSMITHKLINE,          : THAT IS SUBJECT

                                : TO PROTECTIVE ORDER

          Plaintiffs,           :

     v.                         : Civil Action No. 05-197

TEVA PHARMACEUTICALS USA, INC., :

          Defendant.            : Thursday, July 20, 2006

--------------------------------x

Videotaped Deposition of PETER GIDDINGS, a witness

herein, called for examination by counsel for

Defendant in the above-entitled matter, pursuant to

notice and agreement of counsel, commencing at 9:56

a.m., at Wilmer Cutler Pickering Hale & Dorr, LLP,

1875 Pennsylvania Avenue, N.W., Washington, D.C.,

before RYAN C. JACKSON, CSR, Notary Public in and for

the District of Columbia, when were present on behalf

of the respective parties:

9

1      A      I don't recall precisely when.

2      Q      Can you give me an estimate?

3      A      Well, it was -- I first heard soon after

4   the ANDA notice was filed.

5      Q      Are you currently employed by

6   GlaxoSmithKline?

7      A      I am.

8      Q      And what is your title there?

9      A      Head of Patent Administration and

10   Information in the Corporate Intellectual Property

11   Department.

12      Q      And what are your duties as Head of Patent

13   Administration?

14      A      I'm responsible with respect to patent

15   administration for the paralegal staff who take care

16   of all the formalities associated with patent filings

17   around the world and also with data management on our

18   patent applications, for example, to ensure that fees

19   are paid, actions are taken and so on.

20             With respect to information, I'm

21   responsible for a group of U.K. based information

22   scientists who do some searching work for the

10

1    department.

2         In addition, I'm also responsible for

3    managing departmental budgets and expenditures, as

4    well.  And I also have a small portfolio of patent

5    work but it's -- it is relatively small compared to

6    other attorneys in the department.

7         Q    When you say you have a small portfolio of

8    patent work, what do you mean by "patent work"?

9         A    Responsibility for certain patent

10   applications that have been filed and a small area of

11   research where new patent applications may be filed

12   in the future.

13        Q    So would it be fair to say, then, that the

14   patent work that you're responsible for includes

15   drafting patent applications?

16        A    Yes.

17        Q    And would it also include prosecution of

18   those patent applications with various international

19   patent offices?

20        A    It does.

21        Q    And does it also include determining

22   whether a patent application should be filed --

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
Washington, DC

12

1      A      No, I don't.

2      Q      Earlier Ms. Wigmore commented that you're

3   an attorney.  Are you registered with some Bar

4   organization?

5      A      Not with a Bar organization, but I have two

6   qualifications, two legal qualifications.

7      Q      And what are those?

8      A      As a U.K. Chartered Patent Agent and a

9   European Patent Attorney.

10     Q      And did you have -- when did you get those

11  two legal qualifications?

12     A      I got the U.K. qualification in 1985 and

13  the European qualification in 1986.

14     Q      Prior to getting those two legal

15  qualifications, were you employed by GlaxoSmithKline?

16     A      At the time -- at the time of those

17  qualifications, I was employed by a predecessor

18  company of GlaxoSmithKline.

19     Q      Which was?

20     A      Which was Smith Kline & French

21  Laboratories, Limited, which was the U.K. part of

22  Smith Kline Beckman Corporation.

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
Washington, DC

17

1     **A**    **I'm sorry, just one moment.  Okay.**

2     Q    You understand that the '808 patent and the

3    '860 patent are the two that I'm referring to when I

4    refer to the patents-in-suit?

5     **A**    **Yes.**

6     Q    With respect to the prosecution of the '808

7    patent, did you have any involvement in that?

8     **A**    **Can I clarify that you are referring to the**

9    **U.S. '808 patent?**

10    Q    That's right.

11    **A**    **Yes.  No, I did not.**

12    Q    And with respect to the U.S. '860 patent --

13    **A**    **My role with respect to this patent was**

14   **to -- I was responsible for drafting the U.K.**

15   **priority application on which this application is**

16   **based.**

17    Q    When you say you were responsible for

18    drafting the U.K. priority application for the U.S.

19    '860 patent, were you the only person responsible for

20    drafting that priority application?

21    **A**    **I don't -- I don't recall specifically -- I**

22   **don't recall in detail, but I do -- I do recall that**

29

1    inventorship, I would have made an investigation, but

2    I don't remember doing so as I am here today.

3    BY MR. BRAHMA:

4        Q    And because it was your responsibility, no

5    one else would have done it, correct?

6            MS. WIGMORE:  Objection.

7            THE WITNESS:  With respect to this

8    application, that's correct.

9    BY MR. BRAHMA:

10       Q    You said that -- well, correct me if I'm

11   wrong, but my understanding is that you previously

12   testified that for the applications that you were

13   responsible for, when you made a designation of

14   inventorship, you would make an investigation into

15   the inventorship; is that accurate, typically?

16       A    Yes.

17       Q    What type of investigation would you do to

18   determine the proper inventorship of an application?

19           MS. WIGMORE:  And you may answer based on

20   your general custom and practice.  You may not in the

21   course of your answer reveal the substance of any

22   attorney-client communications to the extent you

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER     July 20, 2006
Washington, DC

30

1    remember any.

2         THE WITNESS:  As a general practice, I

3    would talk to the people who provided me the

4    information relating to the invention in the first

5    instance and I would ask them to provide me with

6    details of what they thought their involvement

7    comprised and then also ask them to tell me of any

8    other people who were involved with the work, as

9    well; and then I would talk to those people to see --

10   to get their view, as well, and from that information

11   I'd make a designation of inventorship.

12   BY MR. BRAHMA:

13        Q    And what is the standard for inventorship

14   in the U.K.?

15        MS. WIGMORE:  Objection, calls for a legal

16   conclusion.  You can give your understanding.

17        THE WITNESS:  Well, the standard that we

18   work to is to try and name the people who were

19   actually involved with coming up with the invention.

20   BY MR. BRAHMA:

21        Q    And when you say, "involved with coming up

22   with the invention," what do you mean?

33

1   BY MR. BRAHMA:

2       Q    Can you describe for me your typical

3   process for drafting a patent application.

4            MS. WIGMORE:  Again, you may testify about

5   your general practice, but you may not in the course

6   of your answer reveal the substance of any

7   attorney-client communications.

8            THE WITNESS:  Yes, from a general practice,

9   perspective, usually the first point would be

10  somebody from R&D would come to me with some

11  information that they would like to discuss whether

12  or not that's patent -- it is patentable, and we

13  would look at what information they have and

14  discuss -- discuss putting together a claim a patent

15  claim for the invention bearing in mind any prior art

16  that may be out there affecting the invention and

17  also looking at what might be a reasonable prediction

18  for a generic claim based on the information that we

19  have.

20           And from the claim, my practice was then to

21  turn to drafting a description of the patent

22  application, which is basically the description of

34

1    how to make and use the claimed invention; and at

2    that point I would need from the usually scientists

3    detailed information as to the specific examples of

4    the application, data and so on.

5            And then I would arrive at a draft patent

6    application, and then I would have the people in R&D

7    who have provided me the information review the

8    application and be comfortable that everything that

9    I've said is correct and complete.

10   BY MR. BRAHMA:

11       Q    So let me try and break that down into the

12   individual steps.  You said first that someone from

13   R&D typically comes to you with a proposed invention

14   to patent; is that accurate?

15       **A    Well, they come with information which they**

16   **think might be an invention that is patentable.**

17       Q    And you advise them as to whether it's

18   patentable or not?

19            MS. WIGMORE:  I just want to be clear, and

20   if you'll give me a standing instruction, I'd

21   appreciate it that he is allowed to talk about

22   general practice but that these answers do not reveal

35

1    attorney-client communication and will not be

2    construed in any way as a waiver.

3            MR. BRAHMA:  Actually, it would be helpful

4    to me if you could make that instruction

5    individually.

6            MS. WIGMORE:  Okay.  Then that instruction

7    applies to this question.

8            THE WITNESS:  I'm sorry, could you repeat

9    the question please.

10           MR. BRAHMA:  Could you please reread the

11   question.

12                   (The reporter read the record as

13                   requested)

14           MS. WIGMORE:  Same instruction.

15           THE WITNESS:  Yes, that's part of my role.

16   BY MR. BRAHMA:

17       Q    And then the next step is to develop what

18   you called a generic claim in light of the prior art?

19       **A    Yes.**

20           MS. WIGMORE:  Same objection.

21   BY MR. BRAHMA:

22       Q    Can you tell me what you mean by "a generic

36

1    claim."

2        A    Yes.  Normally when the scientists come to

3    us they have a specific example or specific examples

4    of work, and it is my job as a patent attorney to

5    look at what they have and see if we can -- see if

6    from that we can create a general -- a general

7    formula that covers -- that covers the really the

8    invention that they have so there may be a number --

9    so they have a number of individual examples within

10   that can be encompassed within a broad -- sorry, not

11   necessarily a broad but in the generic formula that

12   protects really the invention, if you like, or the

13   idea that they have which is embodied in those

14   individual examples.

15       Q    And if we could use the '860 patent as an

16   example, is there a generic claim in that patent?

17           MS. WIGMORE:  And, again, I'm going to

18   instruct you not to reveal the substance of any

19   privileged communications you may recall about that

20   patent application process, but you can answer

21   otherwise if you can.

22           THE WITNESS:  Do you want me to look at the

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
Washington, DC

37

1    '860 patent?

2    BY MR. BRAHMA:

3        Q    The '860 patent that has previously been

4    marked as Exhibit 17.

5            MS. WIGMORE:  So the question is does that

6    patent encompass a generic claim?

7    BY MR. BRAHMA:

8        Q    Yes, does the '860 patent have a generic

9    claim as you've used that term?

10           MS. WIGMORE:  You may answer that question.

11           THE WITNESS:  Yes, it does.  Claim 1 is a

12   generic claim.

13   BY MR. BRAHMA:

14       Q    So under the typical process, that generic

15   claim would be something that you came up with; is

16   that correct?

17           MS. WIGMORE:  And again, in your answer you

18   may reveal -- you may discuss your typical practice,

19   but if you have any recollection of the specific

20   process by which you drafted Claim 1, I instruct you

21   not to reveal the substance of any attorney-client

22   communications about that.

38

1        THE WITNESS:  With respect to this specific

2    claim, I don't recall how I have that claim -- how

3    that claim was arrived at.

4        As a matter of general practice, it's

5    something I do in discussion with the people involved

6    with the invention.  So it's a -- it's a joint

7    discussion about the generic scope.

8    BY MR. BRAHMA:

9        Q    But with respect to this specific claim,

10    Claim 1 of the '860 patent, you don't remember

11    whether or how that generic claim was arrived at; is

12    that correct?

13        MS. WIGMORE:  And again, to the extent you

14    recall any substantive communications, I instruct you

15    not to reveal them.  You may answer whether you

16    remember or not.

17        THE WITNESS:  I don't remember.

18    BY MR. BRAHMA:

19        Q    So you also wouldn't remember whether Dr.

20    Owen came up with that generic claim; is that

21    correct?

22        MS. WIGMORE:  Same instruction.  You can

39

1   answer whether you remember anything about how that

2   claim was arrived at.

3          THE WITNESS:  No, I don't remember.

4   BY MR. BRAHMA:

5      Q    Is the generic claim typically broader than

6   the idea that the person from R&D who initially

7   approaches you has come up with?

8          MS. WIGMORE:  Object to the form of the

9   question.  I also instruct you not to reveal the

10  substance of any attorney-client communications in

11  your answer, but you can answer.

12         THE WITNESS:  I don't think it's -- it's

13  not correct to say that it's broader.  It necessarily

14  encompasses more than the specific examples that you

15  have been given but its intent is to cover the

16  concept of the invention, which, rather than saying

17  it's broader than the invention -- or it's not

18  correct to say it's broader than the invention.

19         The invention is the generic claim, and

20  it's defined and it's supported by the specific

21  embodiment -- the specific examples that you have.

22  So it's -- it's -- it's often not -- to say it's one

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER     July 20, 2006
Washington, DC

40

1  invention, it's not broadening the invention.

2  BY MR. BRAHMA:

3      Q    But is it correct to say, then, that the

4  person from R&D who initially comes to you with this

5  specific example doesn't necessarily have to have

6  envisioned the broader generic claim prior to coming

7  to you?

8          MS. WIGMORE:  I'm going to object to that

9  question.  I think it's fine for the witness to

10  testify about general practice, but your questions

11  are going to specifics and calling for I think a

12  specific attorney-client advice which I'm going to

13  instruct him he may not provide.

14          I don't know that there's any situation

15  where that's happened, but he can only testify about

16  general practice.  I'm not going to allow him to

17  reveal any attorney-client communications.

18          THE WITNESS:  I think it would depend is

19  the answer.

20  BY MR. BRAHMA:

21      Q    What would it depend on?

22          MS. WIGMORE:  Same objection.

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
## Washington, DC

45

1      Q    So as far as you know or as far as you

2    remember sitting here today, you may have been the

3    one to come up with the generic claim that's Claim 1

4    of the '860 patent?

5          MS. WIGMORE:  Objection.

6    BY MR. BRAHMA:

7      Q    Is that correct?

8      **A    No, I don't remember.  I don't remember how**

9    **the claim arose.**

10     Q    So based on your recollection sitting here

11   today, you can't say that you were not the inventor

12   of the generic claim that is Claim 1 of the '860

13   patent, correct?

14          MS. WIGMORE:  Objection.  And I instruct

15   you not to reveal the substance of any

16   attorney-client communications in your answer if you

17   recall any.

18          THE WITNESS:  I have no belief that I was

19   the inventor of that claim.

20   BY MR. BRAHMA:

21     Q    And what is the basis for your belief that

22   you were not the inventor of that claim?

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER   July 20, 2006
Washington, DC

47

1      Q    Well, let me rephrase it.  Can you tell me

2  what your basis is for your belief that Dr. Owen is

3  the proper inventor of the claims of the '860 patent?

4          MS. WIGMORE:  And I'm going to instruct you

5  if your answer requires you to reveal any

6  attorney-client privileged communications not to do

7  so.  If you have any non-privileged information

8  that's responsive to that answer, you may provide it.

9          THE WITNESS:  Well, I don't recall the

10  investigation as to inventorship, but my routine

11  practice which I described to you, I have no reason

12  not to believe I didn't do that on this case and come

13  to the decision on inventorship based on that sort of

14  practice.

15  BY MR. BRAHMA:

16      Q    So your only basis for believing that Dr.

17  Owen is the proper inventor of the claims of the '860

18  patent is your belief that you've followed your

19  general practice in preparing patent applications; is

20  that correct?

21          MS. WIGMORE:  I need to go off the record

22  and consult on a privilege issue before he answers

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
Washington, DC

99

1          **A    I don't recall.**

2          Q    Do you know if Dr. Owen ever reviewed the

3    U.K. priority application for the '860 patent before

4    it was filed?

5          MS. WIGMORE:  I'm just going to caution you

6    in your answer not to reveal the substance of any

7    attorney-client communication, but you may answer.

8          THE WITNESS:  I don't recall.

9    BY MR. BRAHMA:

10         Q    Is there anyone else that you think would

11   be able to recall that information?

12         MS. WIGMORE:  Objection.

13         THE WITNESS:  Not within the -- not within

14   the Patent Department.

15   BY MR. BRAHMA:

16         Q    Is there someone outside of the Patent

17   Department that you think would be able to recall

18   that information?

19         MS. WIGMORE:  Objection.

20         THE WITNESS:  Well, I don't know.

21   BY MR. BRAHMA:

22         Q    So, as far as you know sitting here today,

Henderson Legal Services, Inc.
(202) 220-4158

Giddings, Peter  CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
Washington, DC

100

1    Dr. Owen didn't review the patent -- the U.K.

2    priority application before it was submitted to the

3    U.K. Patent Office; is that accurate?

4            MS. WIGMORE:  Objection.

5            THE WITNESS:  No, I didn't say that.  I

6    said I didn't recall doing it.

7    BY MR. BRAHMA:

8        Q    So you don't know whether he reviewed it or

9    not, correct?

10       **A    I don't remember but it's very likely that**

11   **he did because of his involvement with the patent**

12   **application.  I just don't remember doing it.**

13       Q    And is that part of your standard process

14   or general practice to have the inventor review the

15   application before it's filed?

16       **A    Yes, that's right.**

17       Q    And when you in your general practice send

18   the application to the inventor to review before it's

19   filed, do you do that in written form, some written

20   communication?

21           MS. WIGMORE:  You may answer if you have a

22   general practice, but I instruct you not to reveal

Henderson Legal Services, Inc.
(202) 220-4158

101

1   the substance of any attorney-client communications

2   to the extent you recall.

3           THE WITNESS:   I think that would be in

4   written form, yes.

5   BY MR. BRAHMA:

6       Q    But you don't have any specific

7   recollection of whether the application was ever --

8   the U.K. priority application, excuse me, was ever

9   transmitted to Dr. Owen prior to its filing, correct?

10      **A    I don't remember, that's correct.**

11      Q    What about the U.S. application for the

12  '860 patent, do you have any recollection of whether

13  Dr. Owen reviewed the application for the U.S. '860

14  patent before that was filed with the U.S. Patent

15  Office?

16          MS. WIGMORE:   Objection, lack of

17  foundation.

18          THE WITNESS:   Well, I don't have a specific

19  recollection but the -- if I remember correctly, the

20  declaration and assignment form that is signed by the

21  inventor was attached to a copy of the application as

22  was to be filed; and, so, I think in that respect he

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
Washington, DC

102

1    would have seen the specification before it was

2    filed.

3    BY MR. BRAHMA:

4        Q    With respect to the U.K. application, do

5    you have any similar indication or similar basis to

6    believe that Dr. Owen reviewed the application before

7    it was filed?

8            MS. WIGMORE:  Objection.

9            THE WITNESS:  There's not a formal document

10   that he would sign in the same way, just my normal

11   practice that I would send the specification for

12   review before I filed it.

13   BY MR. BRAHMA:

14       Q    Earlier you mentioned that the U.K.

15   priority application was abandoned; is that correct?

16           MS. WIGMORE:  Can you repeat that.  I just

17   didn't hear that.

18   BY MR. BRAHMA:

19       Q    I'll rephrase the question.

20           Was the U.K. priority application for the

21   '860 patent abandoned?

22       A    Yes, it was.

Giddings, Peter  CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
Washington, DC

103

1      Q     And why was it abandoned?

2      **A     Routine practice at the time was to file a**

3   **European patent application covering amongst other**

4   **countries the U.K., and we would do that around about**

5   **the anniversary of 12 months from the initial filing**

6   **and then allow the U.K. case to be abandoned.  So the**

7   **U.K. would be covered by the European patent.**

8      Q     And were you involved in the prosecution

9   the European patent?

10     **A     Yes, I was.**

11     Q     And what was your involvement?

12        MS. WIGMORE:  You can describe generally.

13   I instruct you in your answer not to reveal the

14   substance of any attorney-client communication, but

15   you can answer generally.

16        THE WITNESS:  Well, I was responsible for

17   prosecuting the application for responding to any

18   office actions and seeing the application through to

19   grant.

20   BY MR. BRAHMA:

21     Q     But with respect to the U.S. prosecution

22   for the '860 patent, did you have any specific

104

1    involvement in that U.S. prosecution?

2              MS. WIGMORE:  Objection.

3              THE WITNESS:  The U.S. application and the

4    filing and responsibility for prosecution of the U.S.

5    application primarily was with a U.S. attorney of the

6    Upper Marion department.

7    BY MR. BRAHMA:

8        Q    Did you communicate with the U.S. attorneys

9    that were handling the U.S. prosecution?

10             MS. WIGMORE:  You can answer that question

11   yes, no, or I don't recall, but do not reveal the

12   substance of any communications.

13             THE WITNESS:  I don't recall those

14   communications but I'm sure they happened.

15   BY MR. BRAHMA:

16       Q    Did you transmit to the U.S. attorneys who

17   were handling the U.S. prosecution the application to

18   be filed?

19       **A    Yes, I did.**

20       Q    Did you tell the U.S. attorneys who were

21   handling the prosecution of the '860 patent about the

22   prior art that you were aware of?

Giddings, Peter   CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER    July 20, 2006
Washington, DC

143

1   second paragraph, first five lines, is that

2   information about bromocriptine accurate to the best

3   of your knowledge?

4           MS. WIGMORE:  Objection.

5           THE WITNESS:  Well, to the best of my

6   knowledge.  I have nothing to the contrary.

7   BY MR. BRAHMA:

8       Q    Let me also direct you to the -- strike

9   that.  Let me direct you to the '860 patent itself,

10  Exhibit 17, that was previously handed to you.

11      **A    Yes.**

12      Q    If you could look at column 1, the

13  paragraph starting at line 36.

14      **A    Yes.**

15      Q    Do you see where it says, "An alternative

16  form of therapy is to administer postsynaptic

17  dopamine agonists, for example ergot alkaloids such

18  as bromocriptine"?  Do you see that?

19      **A    Yes.**

20      Q    The characterization there of ergot

21  alkaloids like bromocriptine as postsynaptic dopamine

22  agonists, does that contradict the portion of the

144

1    DeMarinis article that we were just looking at?

2              MS. WIGMORE:  Objection.

3              THE WITNESS:  Well, the sentence in the

4    DeMarinis article, it says it's prejunctional D2

5    receptor agonists.

6    BY MR. BRAHMA:

7        Q     Prejunctional, correct?

8        **A     Prejunctional, yes.  But I don't see that**

9    **it says it's not a postjunctional receptor agonist.**

10   **Well, that would be my observation as I sit here.**

11       Q     Okay.  Well, let's see what you said in

12   Exhibit 133, if we can turn to that.  If you look at

13   the first page of Exhibit 133.

14       **A     Yes.**

15       Q     Do you see the paragraph that starts "To

16   clarify the point"?

17       **A     Yes.**

18       Q     So it says, "To clarify the point raised

19   with respect to the prior art compound bromocriptine,

20   there is an error in the description and is correct

21   to state that bromocriptine is a prejunctional D2

22   receptor agonist."